## THOMAS COCHRAN v. THE STATE.
### *No. 2867.    Decided March 8.*

1.  **Charge of the Court—Manslaughter—"Adequate Cause."**—Any condition or circumstance which is capable of creating sudden passion sufficient to render the mind of a person of ordinary temper incapable of cool reflection may constitute "adequate cause," and where the evidence shows a number of conditions or circumstances tending either singly or collectively to constitute what a jury might consider adequate cause, the charge of the court should leave the jury at liberty to consider them all in determining whether or not adequate cause existed.  See the opinion for a state of proof *held* to demand of the trial court an instruction in conformity with this rule, and for a charge upon the question *held* insufficient because too restrictive, and for requested instructions harmonizing with the doctrine above announced, in refusing which the court erred.

2.  **Same—Self-Defense.**—Upon the issue of self-defense the court instructed the jury as follows:  " If you believe from the evidence before you that the deceased John McLennan made an assault, as hereinbefore explained, upon the defendant, and that the assault was made in such a manner as to reasonably cause defendant to believe that his life was in danger, or that he was in danger of serious bodily injury from the assault, then he was not bound to retreat, but could stand his ground, and the defendant would have the right to defend himself by any means in his power; and if he commenced to shoot as a means of defense, he would be justified in continuing to shoot until he had reason to believe that he was out of danger; and if you can believe from the evidence that the defendant shot the deceased, and that he believed at the time he did so he was in danger of 'losing' his life, or of suffering serious bodily injury at the hands of the deceased, and that he, defendant, acting upon such apprehension of danger as the same appeared to him, then in case you so believe you will find him not guilty."  *Held,* insufficient as to apparent danger, and in failing to instruct the jury that in judging of the danger the facts and circumstances surrounding the defendant must be viewed and estimated from his standpoint and as they appeared to him.   The rule is that "if the jury might believe from the evidence that at the time the defendant fired the fatal shot the deceased was making a violent attack upon him under circumstances which reasonably indicated an intention to murder, maim, or inflict upon him some se-serious bodily injury, and the weapon, and the manner of its use, were such as were reasonably calculated to produce either of those results, then the law presumes that the deceased intended to murder, maim, or inflict such injury upon the defendant; and the jury should have been so instructed in explicit terms, and that in such state of case the homicide would be justifiable."   Upon this subject the court should have further instructed the jury that if the conduct of the deceased at the time of the homicide was such, under the circumstances, as to reasonably produce upon the mind of the defendant the belief that the deceased was then about to kill or inflict serious bodily injury upon

him, the homicide would be justifiable, although in fact the danger was not real, but only apparent.

3. **Practice—Evidence.**—Defendant proposed to prove by his witness W. that he, W., was standing to the left of defendant just before the fatal shots were fired, and that he passed behind defendant because he feared the deceased was going to strike at defendant with the billiard cue and miss defendant and hit him, W. *Held*, that the exclusion of the proposed evidence was error. As bearing upon the probable effect of the conduct of the deceased upon the defendant's mind, it was competent to prove the effect of his conduct upon a bystander's mind.

APPEAL from the District Court of Johnson, on change of venue from Somervell. Tried below before Hon. J. M. Hall.

This conviction was in the second degree for the murder of John B. Mc-Lennan, in Somervell County, on the 25th day of December, 1885. The penalty assessed by the verdict was a term of five years in the penitentiary.

The homicide was committed in the town of Glen Rose, in the saloon of L. B. McLanahan, a diagram of which appears below:

Mart Martin was the first witness for the State. He testified, in substance, that he was in McLanahan's saloon in Glen Rose on Christmas day, 1885, at the time of the killing of McLennan by the defendant, and witnessed that tragedy. McLanahan's saloon fronted west, and had three front doors. The bar counter was situated in the northwest corner of the room, there being an artesian well behind and near the east end of the said counter, which emptied into a basin. The lunch stand was in the southwest corner of the room. The billiard table stood near the center of the room, and a number of whiskey barrels, boxes, etc., were piled against

the wall north of the table. The stove stood east of the billiard table, and the back door was in the east end, and much nearer the south than the north side of the room. At the time of the shooting the witness was standing at the bar counter, about sixteen feet from the billiard table, and twelve feet from the defendant and deceased. The deceased and Bud Stroop were playing billiards just before the shooting. Defendant entered the saloon at the back door. As he came in he threw his hat from him. The hat fell on the billiard table, and from the table to the floor. Bud Stroop picked up the hat, handed it to defendant, and said something to him about having a hard game. A conversation then ensued between deceased and defendant, but witness could not hear what was said. He, however, heard defendant say to deceased, "You need not get your d—d ass up about it." Deceased, who then held his cue in one hand, with the large end resting on the floor, patted defendant on the shoulder with the other hand, and said something to him which witness did not hear, and about that time defendant drew his pistol and fired upon deceased four times. The first ball passed between deceased's legs and went into the floor, the second struck him in the leg about the knee, the third in the breast, and the fourth in the back as he turned to walk around the table, his cue still in his hand, the butt end down. Deceased fell at the south end of the table, and died in McLanahan's arms. Immediately after the shooting defendant ran out of the front doors, and as he fled Byrd Humphreys exclaimed, "Get, damn you!"

Chas. Chandler testified for the State that he was in the saloon at the time of the tragedy. Defendant entered the saloon at the front door, passed through it and out at the back door. He came back through the back door and threw his hat on the billiard table. Stroop handed the hat back to him and said something at which the defendant laughed. He then passed around the north end of the billiard table. He met deceased, who was walking towards him, at the northeast corner of the table. Deceased had his billiard cue in his right hand, the big end up, and pointing somewhat over his shoulder. Witness could not then see what defendant was doing because of the intervening crowd. He could not hear all that was said, but he heard the deceased, as many as three times, say, "That is all right; I am no fighting man, but you can't run over me." When he spoke the last time witness turned to leave the saloon, and before he reached the door he heard three shots fired in quick succession. Witness could not say that deceased was endeavoring or threatening to strike defendant with the cue, but when he last saw deceased he was standing with his billiard cue pointing up and backwards over his right shoulder, the large end up.

L. B. McLanahan testified for the State that he was standing at the lunch counter when the difficulty between the defendant and the deceased began. At the beginning of the row he pressed through the crowd and

placed himself between the contending parties.   He said to defendant,
"Tommie, I want no difficulty here."   Defendant replied, "I don't want
any trouble; I proposed to pay for the game and treat the house if that
will satisfy him."   Defendant then asked the deceased his name, and if
he, defendant, moved any of the billiard balls.   Deceased replied that
none of the balls were moved.   Witness then placed a hand on the shoulder
of both defendant and deceased.   Deceased reached over witness and
patted defendant on the breast, saying, "I am not afraid of you."   He
did this three times, each time pushing witness against defendant and
forcing defendant back towards the pile of whiskey barrels.   Each time he
patted defendant on the breast, defendant said, "Keep your hands off of
me."   The shooting commenced when the deceased patted the defendant's
breast the third time.   Three shots were fired, two of which took effect,
one in the thigh and the other in the breast of deceased.   On receiving
the shot in the breast the deceased passed around the end of the table,
where witness eased him to the floor.   He died a few minutes later without
saying a word.   The billiard cue which the deceased had at the time of
the killing was a 22-ounce instrument, capable of producing death.   De-
fendant was a small, and the deceased a large, powerful man.

J. W. Campbell testified for the State that he heard the shooting from
his livery stable, 300 or 400 feet distant from the saloon.   Four shots were
fired at the time of the killing.   One shot was fired behind the saloon be-
fore the four shots were fired in the saloon.   Defendant always kept his
horses at witness's stable, and had some there at the time of the tragedy,
but his saddle horse was not one of them.

Warmack testified for the State that he was the proprietor of the barber
shop adjoining McLanahan's saloon.   He heard a shot fired outside of the
saloon, and on looking out he saw the defendant, Byrd Humphries, and
L. J. Ward coming towards the saloon from the direction of Campbell's
stable.   Soon afterwards he heard three shots fired in the saloon, and saw
a number of people rush out of the saloon doors.

Mr. Allen testified for the State that he was one of the jury of inquest,
and examined the body of the deceased.   One ball entered the leg above
the knee, another just below the breast bone in the pit of the stomach,
and the third entered the back.

Soaps testified for the State that he saw the defendant leave McLana-
han's saloon immediately after the shooting.   He trotted, bareheaded, to-
wards Campbell's stable until he reached Willingham's store, when he
stopped, straightened up, and exclaimed, "I am the wolf of the woods!"
Duggan corroborated the testimony of this witness.

The witnesses for the defense corroborated those for the State as to what
occurred prior to the shooting up the point where the deceased accosted
the defendant after Stroop picked up the hat and handed it to the defend-
ant.   The remainder of the testimony of the defense witnesses is taken from

correct statement of the same contained in the brief of the defendant's counsel, as follows :

"Byrd Humphries, the man who was with the defendant all the time, further testified as follows: 'Defendant then walked to the north side of the table, and the stranger, who they called McLennan, walked from near the south end of the table around on east side, and met defendant near northeast corner of the table, and told him not to throw his hat on that table any more. Defendant told him that he thought he was one of the boys he knew when he threw his hat; that he did not know he was a stranger to him, and asked if he had moved any of the balls or interfered with the game, and deceased said no. Defendant begged his pardon, and stated that if he had moved the balls or interfered with the game he would pay for it, and they could play it over again. Deceased replied, ' That is all right, but you can't run a blind calf over me.' Defendant asked his name. Deceased replied, ' My name is Jones. I am no fighting man, but I am not afraid of you.' Bud Stroop spoke up and said, 'No, Tom, his name is John B. McLennan.' Deceased then said, ' Yes, my name is John B. McLennan, but I am not afraid of you,' at same time changing the end of his cue and advancing toward defendant, and shaking his left hand at defendant, and holding his cue with big end up in his right hand. He walked up to defendant and tapped him about the breast, saying, 'I have heard of you, but I am not afraid of you.' Defendant said, 'I have proposed everything that is fair, and you will please keep your hands off of me. I am willing to pay for the game and treat the crowd, if that will satisfy you.' About that time L. B. McLanahan walked in between them, and said he wanted no trouble there, and defendant said he wanted no trouble; that he had proposed to do everything that was fair. Deceased reached over McLanahan and tapped or grabbed at defendant with his left hand, at the same time holding his cue up in his right hand in striking position. About this time Rufe Wilson came in and shoved deceased back against the north end of the table, and deceased went around the table; and just as he got on the east side he raised his cue up in his right hand, and advanced on defendant, said, ' God d—n you, I will kill,' or ' fix you,' at same time extending his left hand toward defendant, and when he got in two or three feet of defendant, defendant fired three times. Defendant retreated or backed some eight or ten feet, and deceased advanced on him ten or fifteen feet.'"

Rufe Wilson testified as follows: " The next thing I noticed after the conversation between the defendant and Stroop was defendant and deceased standing near the northeast corner of the billiard table, with McLanahan between them. I heard defendant say, ' I have proposed everything that is fair; I have begged your pardon; I have proposed to pay for the game and to treat the crowd.' At same time deceased was reaching across McLanahan with his left hand, as if to take hold of defendant, or

to slap him, at same time holding his cue in his right hand in a striking position, and defendant was saying, ' Keep your hands off.' Then I ran in and shoved deceased back eight or ten feet, and he caught me with his left hand about the upper vest button and slung me against the table, and then advanced on defendant, saying, ' I will fix,' or ' kill you;' and then the firing began. I heard three shots. Defendant would weigh about 130 or 135 pounds, and deceased about 175 pounds, and was a very stout man. I know that, for I had hold of him, and he tore my vest and slung me against the billiard table."

S. B. Walker testified substantially the same as Byrd Humphries, and in addition that at the time the shots were fired "Rufe Wilson shoved deceased back, and then deceased advanced toward defendant with his cue in his right hand, with big end· up, and in striking position, and said, ' I will fix, or kill you, d—n you,' and defendant drew his pistol and fired." This witness was standing at the north end of the table.

W. W. Wilshire testified as follows: "At the time of the shooting I was standing over on left hand side of defendant, where I had been standing from the time I went around there. I saw deceased advancing toward defendant from back on east side of the table, with his left hand out toward defendant and the billiard cue in his right hand, with big end up, holding it in a striking position. When I saw this I passed right behind defendant, and to his right side; and just then defendant said, ' Keep your hands off, or I will kill you,' and fired three times. I think deceased could have killed defendant with that cue." Nearly every witness testified that the crowd was packed in between where the contending parties stood on the north side of the billiard table and the bar counter, showing that the State witness, Mart Martin, could not have seen the parties at the time of the shooting.

The defendant testified that he left home that morning with about $2700 in his pocket, with which to purchase cattle; there being no banks in that section he had to carry his money with him; that to protect himself and his money he put his pocket pistol ·in his coat pocket; that he lived two miles from Glen Rose; that he passed through town in the morning without stopping, and went beyond there five or six miles, and returned by Glen Rose to buy some fencing wire for a friend; that he bought the wire, and loaned his horse to a friend to ride out in the country; went to the hotel and got his dinner, and then went to the saloon and passed through, and returned through the back door; as he entered the back door a drunken man took his hat and put an old one on his head; that he threw the hat, and it fell on or over the billiard table; that Bud Stroop picked it up and handed it to him, and told him that they had a hard game and not to interfere; that he apologized to Stroop, and that Stroop told him he had not moved the balls or interfered with the game; that he walked to the north end of the table, and threw the old

hat on the whiskey barrels. "I turned and walked up about the northeast corner of the table, and the deceased came up and said to me, 'I have heard of you before, and you can't run over me.' I told him I did not intend any harm by what I had done; that if I had interfered with the game I would pay for it, and pulled out a half dollar and proposed to pay for the game; he refused to accept that; then I proposed to treat the crowd, and he refused that; he advanced to me and slapped my jaws a time or two, and slapped me on the breast, and took hold of my collar, at the same time holding his billiard cue in his right hand; I asked him his name; he said, 'My name is Jones;' Bud Stroop spoke up and said, 'No, Tom, his name is John B. McLennan;' he said, 'Yes, by God, my name is John B. McLennan; I am no fighting man, but d—n you, you can't run a blind calf over me.' I told him I wanted no trouble with him, and to keep his hands off of me. About that time I noticed L. B. McLanahan standing there at my side, and rather between us; he seemed to be considerably excited, and I was too. McLanahan said, 'Tom, I don't want any trouble here;' I told him I did not, and that I had done all I could to settle the matter. In the meantime McLennan was shoving McLanahan back against me. I gave back, and would keep my hands up before my face to ward off his slaps. Just then Rufe Wilson came in and shoved McLennan back some ten feet, as I thought, and he slung Wilson loose, and came at me with his cue up in his right hand in striking position, with big end up, saying, 'I will fix, or kill you, God d—n you.' Just at that instant I pulled my pistol and fired three shots. * * * The deceased looked to me like a very powerful man, and that he would weigh 175 or 180 pounds. I weighed 132 pounds, and was not stout. I know he was very mad when he started at me the last time; he was gritting his teeth and swearing that he would kill me, and he had thrown Wilson out of the way, and had refused to accept all my offers. I felt that he would kill me with that cue when he reached me, and I shot him to save my own life. I did not want to hurt the man. I had never seen him before, and had nothing against him on earth, and I shot to save my own life."

The general reputation of appellant as a peaceable, quiet, inoffensive man was proved by nineteen witnesses, who had known him from eight to thirty-five years. This was not controverted.

*Poindexter & Padleford,* for apppellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WHITE, PESIDING JUDGE.—This appeal is from a judgment of conviction for murder of the second degree.

The main errors complained of are the instructions given by the court

in the charge upon manslaughter and self-defense. The facts in the case clearly raised both of these issues, and demanded of the court a plain and pertinent exposition of the law applicable to the facts which presented them.

Deceased and defendant were strangers, who had never seen each other before the fatal meeting. Defendant came into the room where deceased and another were engaged in a game of billiards. As he entered the door some one pulled off his hat and placed another upon his head, which he jerked off, and in throwing it from him it fell upon the billiard table. Deceased became enraged, approached defendant, and addressed him in an angry and threatening manner. Defendant apologized; made every effort to pacify him; begged for peace. Deceased would accept no apology, but became more and more enraged and threatening in his words and conduct. He had his billiard cue in his hand, uplifted in a striking attitude, and slapped defendant in the face or on the breast. Defendant was much the smaller man, and unable to contend with him. He gave back, or was pushed back by third parties, until he had retreated, or been shoved, to the wall. Deceased, too, was shoved back by third parties, who were endeavoring to separate and keep them apart, but deceased pushed by these parties, advanced again with his drawn billiard cue, a deadly weapon, swearing he would kill defendant; and when he, the deceased, had gotten within four or six feet of defendant, but not within striking distance of him, at the time, with said billiard cue, the defendant fired the fatal shots in rapid succession.

There is no evidence that when deceased slapped or tapped defendant on the face or breast he inflicted either pain or bloodshed upon him.

As to what would constitute "adequate cause" sufficient to reduce the homicide to manslaughter, the court, in the seventh paragraph of its charge, instructed the jury as follows:

"By the expression adequate cause is meant such as would commonly produce a degree of rage, anger, resentment, or terror in the mind of a person of ordinary temper sufficient to render the mind incapable of cool reflection. Insulting words or gestures, however insulting they may be, or an assault and battery, so slight as to show no intention to inflict pain or injury, are not adequate causes sufficient to reduce a homicide from the degree of murder to the grade of manslaughter. But an assault and battery, causing pain or bloodshed, is a sufficient cause to reduce an unlawful homicide to the grade of manslaughter."

This is the only explanation of adequate cause given. Under the facts it was insufficient, and was calculated to mislead the jury. In like circumstances this identical charge was given by the same learned trial judge in Hawthorne's case, *ante*, page 212, and Judge Willson, delivering the opinion of the court, says: "While this portion of the charge is abstractly correct, it is not applicable to the evidence. There was no

proof * * * of an assault and battery, causing pain or blood-shed. Under this charge the only 'adequate cause' was an assault and battery * * * upon the defendant, causing pain or bloodshed. Of course the jury would conclude under this charge that adequate cause did not exist because no such assault and battery was committed. * * * Adequate cause should not have been so restricted. Any condition or circumstance which is capable of creating sudden passion sufficient to render the mind of a person of ordinary temper incapable of cool reflection may constitue 'adequate cause,' and where the evidence shows a number of conditions or circumstances tending either singly or collectively to constitute what a jury might consider adequate cause, the court should leave the jury at liberty to consider them all in determining whether or not adequate cause existed. * * * The jury should have been left free to determine the question of 'adequate cause' from all the facts in evidence tending to show such cause, instead of being restricted as they were by the charge to a single cause, and that a cause not shown by the evidence." Willson's Crim. Stats., sec. 1030; Orman v. The State, 24 Texas Ct. App., 495; Miles v. The State, 18 Texas Ct. App., 156; Wadlington v. The State, 19 Texas Ct. App., 266; Johnson v. The State, 22 Texas Ct. App., 206.

Defendant's counsel excepted to the sufficiency of the charge of the court upon manslaughter, and asked the court to give the following requested instructions:

"1. That you may understand the difference between murder in the second degree and manslaughter, you are, in connection with the general charge of the court upon murder in the second degree and manslaughter, further instructed as follows: When an unlawful killing takes place under the immediate influence of sudden passion, and no cause exists which will under the law justify or excuse its commission, then in order to determine whether such homicide is murder in the second degree or manslaughter, the true test is, was there adequate cause to produce such passion? If such adequate cause existed, the homicide, if not justifiable, would be manslaughter. If such adequate cause did not exist, and if the homicide was not justifiable, then it would be murder in the second degree.

"2. And you are further instructed that any condition or circumstance which is capable of creating and does create sudden passion, such as anger, rage, sudden resentment, or terror, rendering the mind incapable of reflection, whether accompanied by bodily pain or not, is in law 'adequate cause.'

"3. And in this case if you should find from the evidence that the defendant shot and killed John McLennan, and that at the time he did so the actions and words of said McLennan, taken in connection with the physical strength of the said McLennan, was of such nature as to produce 'adequate cause,' as above explained, and did produce such 'adequate cause' sufficient to render the defendant's mind incapable of cool reflec-

tion, and if under the immediate influence of anger, rage, sudden resentment, or terror the defendant shot and killed said John McLennan, and if you are satisfied from the evidence, beyond a reasonable doubt, that the defendant did not kill said McLennan in self-defense, then you should find him guilty of manslaughter."

These instructions were apt, pertinent, and comprehensive, and it was error for the court to refuse them.

Upon the law of self-defense, applicable to the facts of the case as made by the evidence, we are also of opinion that the charge of the court was insufficient as to apparent danger, and in not instructing the jury that in judging of the danger the facts and circumstances surrounding the defendant must be viewed and estimated from his standpoint, and as they appeared to him.

"If the jury might believe from the evidence that at the time the defendant fired the fatal shot the deceased was making a violent attack upon him, under circumstances which reasonably indicated an intention to murder, maim (or inflict upon him serious bodily injury), and the weapon and the manner of its use were such as were reasonably calculated to produce either of those results, then the law presumed that the deceased intended to murder or maim (or inflict such injury upon) the defendant, and the jury should have been so instructed in explicit terms (Penal Code, art. 571; Kendall v. The State, 8 Texas Ct. App., 569), and that in such state of case the homicide would be justifiable. Furthermore, upon this subject the charge should have instructed the jury that if the conduct of the deceased at the time of the homicide was such under the circumstances as' to reasonably produce upon the mind of the defendant the belief that the deceased was then about to kill or inflict serious bodily injury upon him, the homicide would be justifiable, although in fact the danger was not real, but only apparent." Jones v. The State, 17 Texas Ct. App., 602; Bell v. The State, 20 Texas Ct. App., 445; Spearman v. The State, 23 Texas Ct. App., 224; Patillo v. The State, 22 Texas Ct. App., 586; Brumley v. The State, 21 Texas Ct. App., 222. Defendant's special requested instructions, which were refused, called the attention of the court to the defects in the charge above pointed out.

Defendant offered to prove by the witness Wilshire, who was standing just to the left of defendant immediately before the shots were fired, that "the reason he (the witness) passed from defendant's left side around behind his back to his right side, was that he (witness) expected that deceased would strike at defendant with that billiard cue, and that he feared deceased might miss defendant and hit him."

An analogous question is discussed in Thomas v. The State, 40 Texas, 36, and it was held that such character of evidence was admissible, as tending to explain the effect the acts of the party would likely have produced upon the accused. It was said that "the effect produced on a by-

stander by the conduct of the party would illustrate the effect likely to be produced on the mind of the accused himself, and we can perceive no good reason why it should not have been allowed." It was error to reject the evidence.

For the errors above discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Hurt, J., absent.